NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0633n.06
Filed: October 20, 2008

Nos. 07-2319, 07-2560

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| EVERETT HADIX, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| PATRICIA CARUSO, et al., | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: SUTTON and McKEAGUE, Circuit Judges; and FORESTER, District Judge.[*]

SUTTON, Circuit Judge. Plaintiffs, representing a class of inmates in the Michigan State Prison system, appeal the district court's termination of injunctive relief regarding the conditions of confinement within Units A and B of the Parnall Correctional Facility. Because the court correctly determined that the *Hadix* consent decree does not apply to these units, we affirm.

I.

In 1980, a group of inmates in the State Prison of Southern Michigan sued several state prison officials, claiming they had violated the United States Constitution by subjecting them to inhumane conditions of confinement. In 1985, the district court entered a consent decree approving the parties' settlement agreement. The decree required the State to make numerous improvements to the conditions within the "State Prison of Southern Michigan Central Complex, including the Reception and Guidance Center" (SPSM-CC). JA 396. When it entered the decree, the district court for the Eastern District of Michigan expanded the definition of the SPSM-CC, so that it included "all

_____

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

areas which will supply support services under the provisions of this Consent Judgment . . . ." JA 396–97 (internal quotation marks omitted). The State no longer operates a facility known as the "State Prison of Southern Michigan," but some areas of the former SPSM-CC are now part of the Parnall Correctional Facility. *See* Michigan Department of Corrections, Parnall Correctional Facility (SMT), http://www.michigan.gov/corrections/0,1607,7-119-1381_1388-5339–,00.html (last viewed Oct. 17, 2008).

In 2005, after portions of the decree had been transferred to the Western District of Michigan, the court determined that fire safety hazards in Cell Block Eight of the former SPSM-CC violated the Cruel and Unusual Punishments Clause of the Eight Amendment. *See* Findings of Fact and Conclusions of Law ¶¶ 388–90, No. 4:92-CV-110 (W.D. Mich. Sept. 14, 2005). To redress the problem, state officials proposed an amended fire-safety plan, which called for closing Block Eight and transferring its prisoners to Parnall Units A and B. The district court approved the plan, after which state officials transferred the prisoners, and the district court terminated its control over what became an empty Block Eight.

As part of its ruling that Block Eight was no longer subject to its oversight, the district court concluded that Parnall Units A and B were "*de facto Hadix* facilities" and subject to its consent-decree jurisdiction, JA 632 (May 14, 2007), yet the brief order did not discuss whether Units A or B fell within the decree's definition of the "SPSM-CC," JA 631–33. State officials moved for reconsideration of this aspect of the court's decision. *See* Mot. to Terminate Injunctive Relief Regarding Parnall Correctional Facility's (SMT) A Unit, No. 4:92-CV-110, at 3–4 (W.D. Mich Oct 5, 2007); Mot. to Terminate the Ct.'s Jurisdiction Extended Over SMT's B Unit, No. 4:92-CV-110, at 2–3 (W.D. Mich. July 11, 2007). The court then terminated all injunctive relief as to Units A and B on the ground that these units were not supplying "support services" to the original SPSM-CC

facility within the meaning of the consent decree and hence were outside of that decree's scope. *Hadix v. Caruso*, No. 4:92-CV-110, 2007 WL 2701972, at *3–4 (W.D. Mich. Sept. 10, 2007) ("*Hadix III*") (terminating injunctive relief as to Unit B); *Hadix v. Caruso*, No. 4:92-CV-110, Order at 2 (W.D. Mich. Nov. 2, 2007) (relying on *Hadix III* to terminate injunctive relief as to Unit A). The prisoners appeal these decisions.

II.

The consent decree defines the scope of its relief as follows: "The provisions contained herein are intended by the parties to assure the constitutionality of the conditions under which prisoners are incarcerated at SPSM-CC." JA 342. The order implementing the consent decree describes its application to SPSM-CC as follows:

> Due to anticipated structural changes which may result in renaming of certain portions of the facility at issue in this lawsuit, [the SPSM-CC] shall be defined as "all areas within the walls of the State Prison of Southern Michigan at the time this cause commenced and all areas which will supply support services under the provisions of this Consent Judgment*, e.g.,* food service and Boiler Plant operations . . . ."

JA 396–97. Consistent with these orders, the SPSM-CC facility consists of the areas within the walls of the original complex plus any areas that "supply support services under the [Decree's] provisions . . . ." *Id.* The prisoners do not argue that Units A or B are original *Hadix* facilities; they contend only that they are support facilities.

We disagree. By any conventional definition of the terms, it is difficult to see how Units A or B are "supply[ing] support services" to *Hadix* facilities given that these units do not provide a single service to any existing *Hadix* facility. Nor is there any meaningful risk that this is a ruse— that the State plans to return the prisoners back to Block Eight—because that cell block has been

3

closed. Neither party suggests any possibility that the prisoners in Units A and B will be returned to any other *Hadix* facility in the future. These two Units, by any measure, thus do not provide "support" to any portion of the original SPSM-CC facility.

The prisoners counter that Units A and B are support facilities because they "replaced . . . the functions of an original *Hadix* cellblock," Br. at 17, by serving as "replacement housing," Reply Br. at 4. But how can one facility provide "support services" unless there is another facility to support? One of our prior opinions in this case, which considered whether the district court erred by requiring independent monitoring of the mental health care provided to *Hadix* class members in facilities outside of the original SPSM-CC, appreciated and relied upon this distinction:

> It should be made explicit that monitoring outside the SPSM-CC does not apply to transfers based on security or safety concerns or for other administrative reasons, but applies only to *Hadix* prisoners who are sent outside the confines of the SPSM-CC *temporarily* for the purpose of receiving mental health care, *with the anticipation that they will return to the SPSM-CC once treatment is complete.*

*Hadix v. Johnson*, Nos. 93-1551, 93-1555, 93-1559, 93-1560, 93-1642, 93-1643, 1995 WL 559372, at *8 (6th Cir. Sept. 20, 1995) ("*Hadix I*") (second and third emphases added).

This distinction also has the common-sense benefit of confining this decades-long litigation to a reasonable scope. "[T]he prison population is transient[,] and . . . transfers based on security and safety concerns are made with some frequency." *Id*. If the consent decree were to apply to every facility to which a former *Hadix* prisoner might be transferred, Michigan would be faced with an untenable choice: Either the State could keep the entire class housed in the same set of buildings, despite their accelerating decrepitude and despite the advisability of security-related transfers, or it could move the prisoners out into the system, slowly expanding the reach of the decree until it is

4

"extrude[d] . . . amoeba-like throughout the Michigan prison system." *Id.* at *6. Nothing in the consent decree requires us to give it such a broad, uncertain and ever-lasting scope.

The prisoners separately argue that *Hadix v. Johnson*, 367 F.3d 513, 515–17 (6th Cir. 2004) ("*Hadix II*"), requires us to hold that Units A and B come within the consent decree. Not so. In *Hadix II*, we upheld the district court's determination that "Blocks 1 [and] 2 of Egeler [Correctional Facility]" were support facilities, but this determination was based on the *uncontested* district court finding that these Blocks were "deliver[ing] . . . support services." 367 F.3d at 517–18 ("Defendants have presented us with no arguments . . . as to why it was an abuse of discretion to conclude that Blocks 1 and 2 are areas which will supply support services.") (internal quotation marks omitted). The Blocks, moreover, were supplying support services in this sense: Egeler "houses and provides services for prisoners from throughout the State who are receiving short-term medical treatment rendered through Duane L. Waters Hospital [itself a *Hadix*-support facility], and provides custody, security and support services for the hospital." *Hadix v. Johnson*, 45 F. Supp. 2d 584, 586 (E.D. Mich. 1999); *see Hadix I*, 1995 WL 559372, at *6–7 (noting that Duane Waters Hospital provides mental-health services to SPSM-CC inmates). That simply is not the case here, which helps to explain why state officials would concede that support services were being supplied in the one setting but not the other.

Also unconvincing is plaintiffs' reliance on *Glover v. Johnson*, 934 F.2d 703, 709 (6th Cir. 1991). Although the consent decree in that case made an express mention only of certain enumerated women's prisons, *see Glover v. Johnson*, 510 F. Supp. 1019, 1020–25 (E.D. Mich. 1981), we nevertheless applied it to a subsequently opened women's prison, because "the specification by name of the only institutions then housing female inmates . . . certainly was not intended to exclude those female inmates who . . . would be housed at a new location," given that the plaintiffs represented a

5

class of "all female inmates in Michigan including all future inmates," *Glover*, 934 F.3d at 709. Today's class of plaintiffs, however, is defined not as all female (or for that matter all male) inmates but "all prisoners who are, or will be, confined at the State Prison of Michigan—Central Complex." *Hadix III*, 2007 WL 2701972, at *3. The *Glover* consent decree gave the court a handhold for applying the decree to all prisons housing female inmates due to the overlap between the definition of the class and the definition of the scope of the consent decree, while the *Hadix* consent decree offers no similar purchase, because the class is composed only of "all prisoners who are now or will be confined within [the SPSM-CC]." JA 342.

The inmates insist that by "[a]llowing Defendants to destroy the class by simply transferring all the prisoners," we would "deprive the district court of its inherent power to preserve its jurisdiction and enforce its judgment." Br. at 20. We accept for the sake of argument that a district court could indeed respond if it found that the state officials were transferring prisoners away from SPSM-CC in a bad-faith effort to evade the consent decree. *See Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (federal courts possess inherent power to enforce their orders); *Hadix I*, 1995 WL 559372, at *6 ("[D]efendants may not evade the bargained-for requirements of the decree simply by . . . transferring prisoners out of the *Hadix* facility to avoid the need for treatment and monitoring."); *Hadix III*, 2007 WL 2701972, at *4. But there is no evidence that any such sleight of hand is going on here. The district court found that the transfer was a good-faith attempt by the State to "partial[ly] fulfill[] . . . the fire safety aspect of the Consent Decree" and that "[t]here is no indication here that Defendants are manufacturing a pretext for their facility closure and prisoner transfer plan." *Hadix III*, 2007 WL 2701972, at *4. Nor have the prisoners—who did not oppose the transfers, *see* Br. in Opp. To Defs.' March Alternative Plan for Fire Safety, No. 4:92-CV-110, at 20 (W.D. Mich. Apr. 4, 2006); *cf.* Br. in Supp. of Defs.' Req. For Add'l Time to File Alternative Plan, No. 4:92-CV-110, at 3 (W.D. Mich. Jan. 25, 2006)—offered any evidence showing that this finding was clearly

6

erroneous. In the absence of conduct by the State designed to thwart the objectives of the consent decree, or some other material change in circumstances, the district court correctly rejected efforts to expand its jurisdiction over the case. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (noting that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it") (internal quotation marks omitted).

III.

For these reasons, we affirm.